IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 19-cv-02261-RBJ

DENETTE GARCIA,

     Plaintiff,

v.

METROPOLITAN STATE UNIVERSITY OF DENVER,
BOARD OF TRUSTEES OF METROPOLITAN STATE UNIVERSITY OF DENVER,
JANINE DAVIDSON, in her official capacity,
BRAELIN PANTEL, in her official capacity,
DAVE HADEN, in his official capacity,
KELLI FRANK in her official capacity and in her individual capacity,
LAYTON SETH CURL, in his official capacity and individual capacity, and
KRISTEN LYONS in her individual capacity,

     Defendants.

---

## ORDER

---

     This is a civil action brought by Denette Garcia, a former student of defendant Metropolitan State University of Denver ("MSU"), against MSU and MSU's Board of Trustees ("the Board"). In addition, Ms. Garcia brings claims again Janine Davidson, MSU's president; Braelin Pantel, MSU's Associate Vice President of Student Engagement & Wellness and Dean of Students; and Dave Haden, MSU's Associate Dean of Student Engagement & Wellness, in their official capacities. She further joins Layton Seth Curl, the department chair and a professor of psychology at MSU, and Kelli Frank, MSU's Director of Behavioral Intervention and Student Conduct in their official and individual capacities. Finally, she joins Kristen Lyons, an MSU faculty member, in her individual capacity. Amended Complaint, ECF No. 28.

Defendants move to dismiss all claims under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).  ECF No. 31.  For the following reasons, the defendants' motion is granted in part and denied in part.

## BACKGROUND

Ms. Garcia was employed in nursing until she suffered a head injury in 2008.  ECF No. 28 at 4.  She alleges that, as a result of her injury, Ms. Garcia experiences physical and mental impairments that substantially limit her activity.  *Id*.  Her impairments affect her "mental functional ability" and cause "specific learning disabilities."  *Id*. at 4–5.  She has trouble "speaking, learning, reading, concentrating, thinking and communicating and interacting with others."  *Id*. at 5.

After Ms. Garcia became disabled and was unable to continue nursing, she enrolled in college classes part-time.  *Id*.  She enrolled at MSU in 2014, and she has completed 134 credit hours.  *Id*.  Upon enrollment Ms. Garcia requested that MSU grant her accommodations for her disability as required under the Rehabilitation Act, 29 U.S.C.A § 701.  *Id*.  MSU did so.  In addition to other accommodations, MSU provided her with additional time to complete assignments and tests.  *Id*.

During the 2017–18 school year Ms. Garcia was suspended following several interactions with a professor in the MSU psychology department.  *Id*. at 6.  According to MSU, Ms. Garcia sent threatening emails to the professor who refused to change her grade.  ECF No. 31 at 2.  As a result of this incident MSU circulated information about Ms. Garcia and her disability to faculty members.  ECF No. 28 at 6.

Ms. Garcia enrolled in an online child psychology class taught by Dr. Kristen Lyons in the spring of 2019.  *Id*.  Professor Lyons received a letter from Greg Sullivan, Director of the

Access Center at MSU, which told Professor Lyons that Ms. Garcia had requested accommodations and instructed Professor Lyons to review Ms. Garcia's Accommodation Notification Letter and follow its instructions. *Id.* The letter stated that Ms. Garcia was entitled to 100% additional time on quizzes and exams. *Id.*

On February 24, 2019 Ms. Garcia emailed Professor Lyons regarding an article Ms. Garcia had submitted for a class assignment. *Id.* at 7. Ms. Garcia's email stated in relevant part:[1]

> Hello there kiddo, I'm responding to the message you sent below. I was under the impression that we were able to look for articles of our choosing to write a research paper if we are writing a paper to your standards and likening then you'll never know how we write a paper in our own language and words. I will get hold of your friends at the library to see what exactly you want us to do. Can you please try and allow theses kids to explore on their own what they want pertaining to the research so that they are able to stand on their own two feet. Psychology is really difficult because it's not a valid field of practice because Darwin and Froyd based their beliefs on theory while smoking Marijuana I hear, and nothing tested has ever been 100% and there are things that haven't been tested. I've done nursing 22 years and I know it is a valid practice because we know which medicine works and what doesn't and psychology a person just has to guess, for example: The pshch evaluation is not a 100% accurate because we were told by doctor Froyd who helped put the test together, that the test itself will not accomodate other ethnic groups because originally the test was put together in the 1960s to accomidate single white males, so anyone else of another ethnic group or culture will not understand the test and may flunk the test, and yet police departments are still gullible to use it. The same as psychology, we must work together as a team to see what works but if the professor is working against us then we will never learn. For example: Try to send us a sample of an approved article via blackboard on the first day of class so that were not trying to guess? This approach would have worked better, because if you had sent a sample of the articles when class started then I wouldn't have been given a bad grade twice by you. As far as your message below and the sample you provided I did receive it the other day and will try and work as fast as I can with the little time I have to get you the paper.

*Id.* at 7–8.

---

[1] The emails exchanged between parties have been reproduced in this opinion verbatim without multiple [sic] indicators, though they contain many misspellings and other mistakes.

Professor Lyons responded describing the requirements for the assignment and the exam review policy. That same day, Ms. Garcia replied as follows:

> Also Mrs. Lyons the exam yesterday was a lot, especially since it was 5 chapters which is hard to remember and can be very traumatizing, Is there anyway we can get a study guide? I'm only human and my brain doesn't carry that much information. Psychology Doctor Froyd once said that a person can only remember 10% of what they learned in a week and I sure do believe that! Also some of the questions on the exam were quite vague or misspelled and misleading, for example question 8 says "Which which of the following theories places the heaviest emphasis on the biological bases of behavior? And then some of the answers were not what we read about, unless I have the wrong book. Another question that didn't make sense was question 10 which says "Studies have found that children report that vegetables taste better when they are served the vegetables in a Macdonalds box compared to a plain box". I don't understand this statement because it doesn't make sense. If you don't mind me saying, Whoever wrote this test is not very good in the English language because they are not using sentences, verbs, nouns, etc, the way they are supposed to be used which can mislead students and can cause them to choose the wrong answer like myself because it confuses the human brain. Another question that was misleading and wasn't spelled right is question which says "Linda is a neuroscientist who studies brain development. She studies; "the definition of a Neuroscientist, is the study and development of the nervous system, which includes the brain, spinal cord, and nerve cells through the body. So I picked "cognitive", as my answer and it still said it was wrong? Even though cognitive has to do with the brain, because it has to do with mental processing, so the answer should have been right I have friends that are neuroscientist and they say they study cognitive development. So hopefully we can work together to fix this problem on the exams, and if there is any way to give us students credit that missed these questions because they are very confusing.

*Id*. at 8.

That day Professor Lyons submitted a "Care Report" to Kelli Frank, the director of behavioral intervention and student conduct. *Id*. at 9. The report stated:

> Before the semester started, I was informed by my department chair that a student who was enrolled in my online Child Psychology class had in previous semesters encounters with faculty that met standards for violating student codes of conduct. I received an email from this student today (attached). I reached out to ask advice from my chair for how to respond and he advised that I file a care report and pass along this email. I have replied to the student email (I am also attaching my reply) but have not informed the student that I am filing this report.

*Id.*

On February 25, 2019 Professor Lyons emailed the entire class regarding the exam and stated that students who were confused by questions or felt they should have earned more points could email her pursuant to the appeal policy detailed in her syllabus. *Id.* She explained that requests for re-scoring must "include evidence from the notes or book about why you think your answer was correct." *Id.* Other students apart from Ms. Garcia expressed concerns about the test questions. *Id.*

On February 26, 2019 Professor Lyons emailed Ms. Garcia stating that "the exam question appeal policy requires that you give evidence from the textbook or notes for why your selected answer should be counted as correct. If you wish to appeal, please provide the number of the question and the evidence for why you believe your answer should be counted as correct." *Id.* at 9–10.

Ms. Garcia responded that day, stating

> I already gave you the numbers. Mrs. Lyons it is unethical to give a test that doesn't have the proper writing in english and per msu requirements the material you use for the class cannot be made to trick or mislead the students, or be set up to where it's going to make them fail, so I put in a complaint with the department of higher education and the college President since I'm paying you guys for the class, I will also sit down with DORA later. But I will say no more, and I will just get through the class. And then at the end of class I will sit down with you and have a meeting but right now all I want is to get through the class, I'm not going to argue if your not comprehending what is said, and we are not a daycare center. So that being said I will look over the article you provided this week, but it would help the students if there is a sample article you can give at the start of the class so that they are not left in the dark.

*Id.* at 10.

Professor Lyons forwarded the email to Ms. Franks. *Id.* That day psychology department chair Layton Curl sent an incident report to the dean of students, which described Ms. Garcia's "escalating hostility and written threats toward her instructor, now Dr. Kristy

Lyons." *Id.* Professor Curl stated that Ms. Garcia "further threatens Dr. Lyons with multiple complains to DORA and the MSU Denver President, in an apparent veiled attempt to coerce Dr. Lyons to falsely adjust her grade." *Id.* In Professor Curl's opinion, "Ms. Garcia's repeated violations and lack of improvement indicate she lacks the capacity to remediate her behavior. As such, options to resolve the situation permanently should be considered for the welfare of faculty members." *Id.* at 10–11.

On February 27, 2019 Professor Lyons emailed Ms. Garcia stating "[i]f you would like consideration for regrading, you need to submit the test question numbers and evidence from the textbook/notes to support why you think your choice was correct." *Id.* Ms. Garcia did not respond. *Id.* at 11.

On March 1, 2019 Ms. Frank sent Ms. Garcia a letter stating that her office had received a report about an incident on February 26th. *Id.* According to the letter, Professor Lyons had complained that Ms. Garcia was "showing a pattern of increased hostility." *Id.* Professor Lyons stated that Ms. Garcia had accused her of being unethical, "writing a test that is not written properly in English," and using material to trick or mislead students. *Id.* She also stated that Ms. Garcia had previously "emailed in a harassing way regarding feedback on a paper assignment." *Id.* She expressed concern that the pattern would escalate. *Id.* Ms. Frank's letter stated that Professor Lyons had suggested that Ms. Garcia had violated the MSU Student Code of Conduct regarding verbal threats and attempts to influence the academic process. *Id.* at 11–12. No other students from Professor Lyons' class were reported. *Id.* at 12. The letter indicated that Ms. Garcia was prohibited from participating in the online class, or contacting Professor Lyons, until the case was resolved. *Id.*

Ms. Garcia emailed responses to Ms. Frank on March 1, March 4, and March 5, asking to remain in class. *Id.* at 13. In her response she indicated that she had apologized to Professor Lyons and that "part of my head injury doesn't allow me to say things in a full sentence or pick words that are courteous because I lost that part of my brain during the injury and sometimes people get offended because they are misinterpreting things differently that I say, (Please look up people with head injury limitations). I ask you guys to please let me stay in the class." *Id.* at 13–14. Ms. Frank responded, offering Ms. Garcia dates to schedule a hearing on either March 11, March 12, or March 13. Ms. Garcia informed Ms. Frank she had an attorney, but that the attorney was not available until the end of the month. She requested that the hearing be set for later that month. *Id.* at 14–15.

No hearing was held, and on April 10, 2019 Ms. Frank sent Ms. Garcia a letter suspending her from MSU until August 3, 2020. *Id.* at 16. The letter indicated that Ms. Frank had found that Ms. Garcia had violated the following sections of Article III, Section B of the MSU Student Code of Conduct:

> 03.a. Verbal abuse, threats, intimidation, coercion or any unwelcome conduct by an individual(s) that is sufficiently severe or pervasive that it alters the conditions of education or employment and creates an environment that a reasonable person would find intimidating, hostile or offensive.

> 06. Failure to comply with a reasonable request from University officials or sworn law enforcement officer acting in performance of their duties and/or failure to identify oneself to these persons when requested to do so.

> 21. Influencing or attempting to influence the academic process through explicit or implied sexual behavior, bribery, or threats.

*Id.* at 17. Ms. Frank stated that "threatening to complain to the Department of Higher Education and DORA: which was addressed in your prior conduct case as an escalating way to address a

concern you have with a professor.  It can also be considered disruptive and an attempt to influence the academic process in your favor." *Id*.

In support of the action, Ms. Frank also stated

Insisting that your professor's exams are not legible and are unfair: 'Whoever wrote this test is not very good in the English language because they are not using sentences, verbs, nouns, the way they are supposed to be used which can mislead students' in and email on 2/26.  You go on to suggest that your professor is "unethical", "tricking or misleading students', and state that you will not argue with her because, "we are not a daycare center".  You also allege that your professor was "putting students down on discussion boards" and "working against us".  On 2/24, you also wrote that "Psychology is not a valid of practice because Darwin and Froyd based their beliefs on theory while smoking marijuana I hear." After reviewing content from the discussion boards and all email interactions between you and your professor, I found no evidence to support your claims that the professor was unfair or unreasonable to you or other students.

*Id*. at 18.

Ms. Frank continued: "In an email to me, you also claimed that Dr. Lyons 'encouraged me to stay in class,' and yet Dr. Lyons said she had not had any contact with you since the restriction was put into place, let alone to encourage your return to class.  I perceive that your comment may have been made in an attempt to persuade me to allow you back into the class with false information." *Id*. at 18–19.  The letter required Ms. Garcia to "complete a Psychological Fitness to Return evaluation" as well as to "complete a reflection paper about college student's rights and responsibilities . . . and should address the following topics: definitions of HIPPA and FERPA and your understanding of the relationship between student conduct codes and academic accommodations." *Id*. at 19.

Ms. Garcia filed this lawsuit on August 8, 2019.  ECF No. 1.  She filed an amended complaint on October 10, 2019, ECF No. 28 and defendants filed a motion to dismiss that complaint on October 24, 2019, ECF No. 31.  Ms. Garcia filed a response on November 19, 2019, ECF No. 31 and defendants replied on December 19, 2019, ECF No. 37.

**STANDARD OF REVIEW**

### A. <u>Fed. R. Civ. P. 12(b)(1)</u>

Rule 12(b)(1) empowers a court to dismiss a complaint for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction.  *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).  A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusionary allegations of jurisdiction."  *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971).  When considering a Rule 12(b)(1) motion, however, the Court may consider matters outside the pleadings without transforming the motion into one for summary judgment.  *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).  Where a party challenges the facts upon which subject matter jurisdiction depends, a district court may not presume the truthfulness of the complaint's "factual allegations . . . [and] has wide discretion to allow affidavits, other documents, and [may even hold] a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)."  *Id.*

### B. <u>Fed. R. Civ. P. 12(b)(6)</u>

To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While courts must accept well-pled allegations as true, purely conclusory statements are not entitled to this presumption.  *Id.* at 678, 681.  Therefore, so long as the plaintiff pleads sufficient

factual allegations such that the right to relief crosses "the line from conceivable to plausible," she has met the threshold pleading standard. *Twombly*, 550 U.S. at 556, 570.

**ANALYSIS**

Defendants argue that this Court lacks jurisdiction over MSU because MSU is not a corporate entity capable of being sued. ECF No. 31 at 6. They argue that all Ms. Garcia's official capacity claims are barred under the Eleventh Amendment. *Id*. They also argue that all defendants are entitled to qualified immunity for the constitutional claims against them in the individual capacities. *Id*. at 16. Finally, they argue that Ms. Garcia has failed to plausibly state a claim under Rule 12(b)(6). *Id*. at 8–16. I address each argument in turn.

### A. <u>Jurisdiction Over MSU</u>

Defendants argue that this Court lacks jurisdiction over MSU because "[t]he school's governing statutes do not create any authority for MSU to be sued as a separate legal entity." *Id*. at 6. Instead, Ms. Garcia must sue the Board who are "vested with general control and supervision of MSU." *Id*.

Ms. Garcia does not contest this argument, instead noting that her amended complaint adds the Board as a defendant, and that references throughout her complaint to MSU refer to the Board. ECF No. 34 at 5. The complaint does, however, name MSU as a defendant in the caption, in addition to the Board. ECF No. 28. Because both parties agree that MSU is not a proper defendant in this case, all claims against MSU are dismissed.

### B. <u>Eleventh Amendment Immunity</u>

The Eleventh Amendment of the United States Constitution bars claims brought in federal courts against states, state agencies, and state officials when sued in their official capacity for damages or retroactive relief. *See Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974).

"Because an assertion of Eleventh Amendment immunity concerns the subject matter jurisdiction of the district court, [the Court] address[es] that issue before turning to the merits of the case." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002).  Additionally, a suit against an officer in her official capacity "is no different from a suit against the State itself."  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  However, the Eleventh Amendment does not bar suit against an officer in her individual capacity.  *See Hafer v. Melo*, 502 U.S. 21, 30–31 (1991).

Defendants argue that the Eleventh Amendment bars all claims against them in their official capacities.  ECF No. 31 at 6–7.  I agree.  Defendants Janine Davidson, Braelin Pantel, Dave Haden, Layton Seth Curl, and Kelli Frank are joined as state officials, in their official capacities as MSU employees and directors.  Therefore, the Eleventh Amendment bars Ms. Garcia's § 1983 claims for damages against them in that capacity.  Thus the § 1983 claims for damages against Janine Davidson, Braelin Pantel, Dave Haden, Layton Seth Curl, and Kelli Frank in their official capacities must be dismissed.

Defendants argue that Ms. Garcia's claims for prospective relief are also barred despite the well-established rule from *Ex Parte Young* that the Eleventh Amendment does not bar prospective relief against state officials.  209 U.S. 123, 155–56 (1908); s*ee also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) (citing *Ex Parte Young*, 209 U.S. at 150–51) ("[W]e have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law.").  Defendants claim that *Ex Parte Young* does not allow suit against these defendants in this case because "[o]ne requirement for proceeding under *Ex Parte Young* is that the defendant be an individual state official charged with enforcing whatever law is at issue."  ECF No. 31 at 7.  Defendants rely on *Doe v. University of Colorado, Boulder*, in which the court found that plaintiff seeking

expungement of his disciplinary records needed to sue the university official "charged with enforcing whatever law is at issue." 255 F. Supp. 3d 1064, 1082 (D. Colo. 2017). The court in that case dismissed plaintiff's claim without prejudice, indicating plaintiff should amend its complaint naming the appropriate official. *Id*. at 1083.

The decision in *Doe*, which does not bind this court, relied on two Tenth Circuit cases: *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014) and *Peterson v. Martinez*, 707 F.3d 1197, 1207 (10th Cir. 2013). In *Kitchen*, the Tenth Circuit allowed a plaintiff seeking a same-sex marriage license to sue the county clerks in charge of issuing marriage licenses. 755 F.3d 1193, 1201 (10th Cir. 2014). The court stated that the "state defendant sued in his official capacity must 'have some connection with the enforcement' of a challenged provision." *Id*. (quoting *Ex Parte Young*, 209 U.S. at 155–56). In *Peterson* the Tenth Circuit stated that "[c]onnection to the enforcement of an act may come by way of another state law, an administrative delegation, or a demonstrated practice of enforcing a provision." 707 F.3d at 1207. "Defendants are not required to have a 'special connection' to the unconstitutional act or conduct. Rather, state officials must have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty." *Id*. at 1205 (quoting *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir.2007)) (internal quotations omitted).

Defendants argue that because Ms. Garcia seeks an injunction against her suspension and expungement of her academic records, "the proper defendant would be whomever is charged with reviewing suspensions and expunging student records." ECF No. 31 at 7. They claim that they conferred with Ms. Garcia about the appropriate defendant, but that Ms. Garcia refused to dismiss her claims and amend her complaint accordingly. *Id*. at 7 n.3. Ms. Garcia argues that

the defendants "were charged with enforcing prospective injunctive relief" that she requests and are therefore proper.  ECF No. 34 at 7.

Defendants are correct that the official must have a connection to the unconstitutional act or conduct in question.  However, defendants have cited no case law suggesting that this allows them to specifically designate whom a plaintiff gets to name in a particular suit.  As long as Ms. Garcia's complaint alleges specific facts showing that defendants have sufficient connection with the act or conduct, she may join those parties under *Ex Parte Young*.

In *Kitchen* for example, the Tenth Circuit found the Utah governor and attorney general's "actual exercise of supervisory power and their authority to compel compliance from county clerks and other officials provide[d] the requisite nexus" between defendants and the unlawful act or conduct by the lower officials.  755 F.3d at 1204.  This relatively broad view of the required connection between the defendants and the act or conduct suggests Ms. Garcia need only plausibly allege that defendants either directly participated in the act or conduct or exercise supervisory power and may compel compliance on the part of those who do.

Ms. Garcia alleges that Dr. Davidson, Ms. Pantel, Mr. Haden, Professor Curl, and Ms. Frank "are charged with enforcing the disciplinary actions and . . . enforcing prospective injunctive relief."  ECF No. 34 at 7.  She also alleges that these defendants "are continuing to permit an ongoing violation of Ms. Garcia's right as described above and have the authority to enforce the disciplinary sanctions against Ms. Garcia."  *Id.*

It seems clear that the MSU president, Dr. Davidson, has sufficient connection to the conduct at issue here.  The president of the university, like the Utah Governor in *Kitchen*, surely has supervisory power over and may compel compliance from whatever officials are directly

13

responsible for enforcing the challenged conduct. Therefore, I find Dr. Davidson is an appropriate defendant under *Kitchen*.

I also find that Ms. Frank and Mr. Haden are proper defendants, based on the factual allegations in the Amended Complaint which I accept as true at this stage of the case. Ms. Garcia has alleged that Ms. Frank and Mr. Haden jointly made the decision to suspend Ms. Garcia. ECF No. 28 at 16. Ms. Frank then sent the March 1, 2019 and April 10, 2019 letters prohibiting her from attending class and subsequently suspending Ms. Garcia from MSU. ECF No. 28 at 13–14. From these facts, it is plausible that either Ms. Frank or Mr. Haden could lift Ms. Garcia's suspension and alter the other sanctions imposed on her.

The remaining official capacity defendants however must be dismissed. Ms. Garcia has not sufficiently alleged Ms. Pantel, the Vice President of Student Engagement & Wellness, has the requisite connection to the challenged conduct. Ms. Garcia's only allegations regarding Ms. Pantel are conclusory: The complaint states that Ms. Pantel has "authority to make, enforce, or adopt MSU's policies and practices concerning student affairs and student conduct including disciplinary action against Ms. Garcia," and that she is "continuing to permit an ongoing violation of Ms. Garcia's rights." ECF No. 28 at 2–3; 24. She also claims Ms. Pantel had

> authority to address the alleged discrimination and retaliation and to institute corrective measures on MSU's behalf, had actual knowledge of discrimination against Ms. Garcia, and failed to adequately respond, demonstrating deliberate indifference to the discriminatory/retaliatory conduct as well as Ms. Garcia's constitutional rights.

*Id*. at 21. However, she makes these conclusory allegations with regard to all official capacity defendants. *Id*. Ms. Garcia has not alleged any actual facts regarding Ms. Pantel that would indicate she has the requisite connection to the act or conduct. Nor can I assume without more support, as I could with Dr. Davidson, that Ms. Pantel necessarily exercises relevant supervisory

power or authority to compel compliance. Because Ms. Garcia has not alleged that Ms. Pantel has sufficient connection to the challenged conduct, she is not a proper defendant and must be dismissed.

Lastly Ms. Garcia also joins Professor Curl, the chair of the psychology department, who filed an incident report against Ms. Garcia regarding her interactions with Professor Lyons. ECF No. 28 at 3. Though there are more specific facts alleged about Professor Curl, none suggests that he maintains any power to alter Ms. Garcia's suspension or other sanctions. Indeed, Professor Curl was unable to impose sanctions himself but rather requested that decisionmakers consider them. *Id*. at 10–11. Because Ms. Garcia has not alleged sufficient facts that Professor Curl has the requisite connection to the challenged conduct, he must be dismissed as well.

Defendants also argue that Ms. Garcia actually seeks declaratory relief, rather than prospective relief, and therefore her claims do not qualify under the *Ex Parte Young* exception to Eleventh Amendment immunity. ECF No. 31 at 8. *Ex Parte Young* "applies only to prospective relief and may not be used to obtain a declaration that a state officer has violated a plaintiff's federal rights in the past." *Johnson v. W. State Colorado Univ.*, 71 F. Supp. 3d 1217, 1230 (D. Colo. 2014) (quoting *Puerto Rico Aqueduct v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)) (internal quotation omitted).

Ms. Garcia seeks expungement of disciplinary proceedings from her record and an injunction against MSU's enforcement of the sanctions imposed on her, including "the prohibition that she not be present on the Auraria campus under threat of arrest, requiring her to undergo and pay for at her own expense a psychological exam and requiring her to write a paper." ECF No. 34 at 7. She also seeks immediate reinstatement as a student and that MSU allow her to complete the psychology class from which she was suspended. *Id*.

Ms. Garcia's request for expungement of her records is prospective and therefore falls within the *Ex Parte Young* exception. *See Johnson*, 71 F. Supp. 3d at 1230 (finding that "a request to expunge an academic record is a request for prospective relief" and not barred by the Eleventh Amendment); *see also Doe v. Cummins*, 662 F. App'x 437, 444 (6th Cir. 2016) (unpublished) (finding no Eleventh Amendment bar to expunging record of sexual assault discipline from a state university's files); *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (negative entries in a student's university records stemming from an allegedly unconstitutional action presented a continuing violation sufficient to overcome Eleventh Amendment immunity).

Ms. Garcia's requested injunctions prohibiting enforcement of sanctions and immediate reinstatement contemplate prospective relief as well. This does not involve, as defendants suggest, merely a dispute about the lawfulness of defendants' past actions as in *Green v. Mansour*, 474 U.S. 64, 73 (1985). Even though, as defendants note, the injury Ms. Garcia complains of occurred in the past, the relief she requests would bar defendants' future actions against her.

Insofar as Ms. Garcia seeks expungement of her records and injunctive relief prohibiting enforcement of sanctions against her and requiring her reinstatement, her official capacity claims are not barred against the remaining individual defendants, Dr. Davidson, Ms. Pantel, and Ms. Frank.

**C.  <u>Qualified Immunity</u>**

Defendants argue that Ms. Garcia's individual capacity First Amendment and due process claims against Ms. Frank, Professor Curl, and Professor Lyons must be dismissed because those defendants are entitled to qualified immunity.[2] ECF No. 31 at 16. Qualified immunity protects

---

[2] The defendants argue that individual capacity claims against Mr. Haden must be dismissed, but Ms. Garcia's complaint does not join Mr. Haden in his individual capacity. ECF No. 28.

government officials acting in their individual capacity from liability for civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When qualified immunity is asserted by an official, a plaintiff must satisfy the burden of showing (1) that the defendant violated a constitutional right (2) that was clearly established at the time of violation. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A reviewing court has discretion to address either prong first. *See Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)) (internal quotations omitted). "A plaintiff may show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation." *Ali v. Duboise*, 763 F. App'x 645, 650 (10th Cir. 2019) (unpublished) (citing *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017)) (internal quotations omitted). "[C]learly established law should not be defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)) (internal quotations omitted). "Although a plaintiff need not identify a case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate." *Ali*, 763 F. App'x at 650 (citing *Mullenix*, 136 S. Ct. at 308) (internal quotations omitted); *see also White*, 137 S. Ct. at 551.

Ms. Garcia alleged defendants violated her First Amendment freedom of speech rights, her Fourteenth Amendment procedural and substantive due process rights, and her rights under

the Rehabilitation Act.  I examine whether defendants are entitled to qualified immunity for each of these claims in turn.

1.  First Amendment Claim

"It is well established that students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'"  *Pompeo v. Bd. of Regents of the Univ. of New Mexico*, 852 F.3d 973, 982 (10th Cir. 2017) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)).  However, federal courts "do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."  *Id*. at 977 (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)) (internal quotations omitted).  The Tenth Circuit has held that the test for determining whether a student's speech falls within First Amendment protection is "whether an action restricting a plaintiff's school-sponsored speech is reasonably related to the [school's] legitimate pedagogical interests."  *Id*. at 983 (quoting *Vanderhurst v. Colo. Mountain Coll. Dist.*, 208 F.3d 908, 914 (10th Cir. 2000)) (internal quotations omitted).

Defendants argue that Ms. Garcia's speech lacks First Amendment protection because it is not a matter of public concern.  ECF No. 31 at 10–11.  Whether speech touches on matters of public concern is the standard for determining whether government employees' First Amendment rights have been violated and has no relevance here.  *See Connick v. Myers*, 461 U.S. 138 (1983).  In support of their argument that this standard governs students, defendants cite only one Tenth Circuit case, *Marcum v. Dahl*, 658 F.2d 731, 734 (10th Cir. 1981).  This case is contradicted by more recent Tenth Circuit precedent that did not require students to show their speech was a matter of public concern.  *See*, *e.g.*, *Pompeo*, 852 F.3d at 982; *Hunt v. Bd. of*

*Regents of Univ. of New Mexico*, No. 18-2149, 2019 WL 6003284, at *6 (10th Cir. Nov. 14, 2019).

It is also contradicted by Supreme Court case law applying the public concern requirement only to government employees specifically because of the unique employment relationship. *See*, *e.g.*, *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574–75 (1968); *Waters v. Churchill*, 511 U.S. 661, 675 (1994) ("The key to the First Amendment analysis of government employment decisions . . . is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.")

Finally, other Courts of Appeal have found explicitly that the requirement does not apply to students. *See*, *e.g.*, *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 106 (2d Cir. 2001) ("[T]he public concern doctrine does not apply to student speech in the university setting, . . . but is reserved for situations where the government is acting as an employer.") (citing *Qvyjt v. Lin*, 932 F. Supp. 1100, 1108–09 (N.D. Ill. 1996)) (internal citations omitted).

Defendants argue that "insisting that Ms. Garcia engage respectfully" is a legitimate pedagogical purpose for their conduct. ECF No. 31 at 11. Ms. Garcia argues that MSU originally justified its actions by characterizing Ms. Garcia's emails as "threatening conduct" towards Professor Lyons, and that its current argument asks the court to "reframe the University's stated reason for the disciplinary decision." ECF No. 34 at 14.

Ms. Garcia is correct that her suspension and other sanctions stemmed from concerns including her threat to report Professor Lyons to various educational authorities if her grade was not changed. However, reacting to this threat reflects a legitimate pedagogical interest in insisting that Ms. Garcia engage respectfully. Threatening conduct is concerning for multiple reasons, including the pedagogical implications for Ms. Garcia's relationships with her professors. I do not need to reframe the University's original justification for the disciplinary decision to find that defendants' actions could conform to the stated legitimate pedagogical purpose. I do not agree that MSU's justification today contradicts their previous explanations. However, I do not address whether defendants' conduct was a constitutional violation because I find that, regardless, it was not a clearly established constitutional violation.

It is not clearly established that defendants' conduct violated the First Amendment. To meet her burden Ms. Garcia must show binding or extremely persuasive precedent suggesting that any reasonable university official would have known they violated Ms. Garcia's rights in these circumstances. Ms. Garcia provides no case law suggesting the issue was clearly established. ECF No. 34.

She does rely on *Seamons v. Snow* to support her First Amendment claim. 206 F.3d 1021 (10th Cir. 2000). In *Seamons*, the Tenth Circuit held that "school authorities may not penalize students for their speech when that speech is non-disruptive, non-obscene, and not school-sponsored." *Id*. at 1030. The court found that it was a clearly established violation of the First Amendment to suspend and dismiss a player from the football team after he refused to apologize for reporting his teammates' assault of him to police and school authorities. *Id*. To do so, the court relied on a line of cases finding that schools and coaches may not penalize student athletes for engaging in peaceful speech that does not "create substantial disorder, materially disrupt class

work, or invade the rights of others." *Id*. This line of cases and *Seamons* itself are factually distinguishable from the facts here, in which MSU officials could have reasonably believed that Ms. Garcia's speech would "substantially interfere with the work of the school" in achieving an unimpeded and fair grading system free of undue influence by students. *Id*. at 1237 (citing *Tinker*, 393 U.S. at 509) (internal quotations omitted). Therefore, defendants are entitled to qualified immunity and the First Amendment claim must be dismissed.

2. Procedural Due Process Claim

Students facing suspension have a due process interest and are entitled to at least minimal procedural protections. *Goss v. Lopez*, 419 U.S. 565, 579 (1975). In *Goss* due process required that the school provide notice and an informal hearing, "preferably prior to the suspension." *Id*. at 584. Regarding the timing of the hearing the Court held:

> Since the hearing may occur almost immediately following the misconduct . . . as a general rule notice and hearing should precede removal of the student from school. We agree with the District Court, however, that there are recurring situations in which prior notice and hearing cannot be insisted upon. Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school.

*Id*. at 582. *Goss* addressed suspensions shorter than ten days, and the Court noted that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id*.

MSU formally suspended Ms. Garcia on April 10, 2019, through the letter written by Ms. Franks. ECF No. 28 at 16. However, on March 1, 2019 MSU sent a letter stating that Ms. Garcia was prohibited from attending Professor Lyons' class or communicating with Professor Lyons in any way "until this case is resolved." ECF No. 6-2. Ms. Garcia argues, and defendants do not contest, that this amounts to a suspension beginning on March 1. ECF No. 34 at 17–19;

ECF No. 37 at 6.  I agree that Ms. Garcia's initial suspension began on March 1 and continued until April 10, at which point her suspension was expanded until August 3, 2020.  Because Ms. Garcia was suspended for far longer than ten days, she was entitled to at least the amount of process described the *Goss* court.

Applying the *Goss* standard, Ms. Garcia argues that she was denied due process because she received a letter on March 1, 2019 suspending her from class immediately.  ECF No. 34 at 17–18.  No hearing was held prior to her suspension, and the only notice came in the form of the March 1 letter suspending her.  Though she was offered a hearing after her suspension went into effect, no hearing was ever held.  Defendants argue that Ms. Garcia received adequate notice in the form of the March 1, 2019 letter and had the opportunity to be heard when Ms. Frank offered her hearing dates, which she declined.  ECF No. 31 at 13–14.  But, accepting her allegations as true, she did not decline a hearing.  Rather, she asked that the hearing take place later in the month when her lawyer would be available.

Absent the exceptional circumstances articulated in *Goss*, Ms. Garcia was entitled to at least an informal hearing prior to her suspension.  *Goss* held that as a "general rule" notice and a hearing should precede suspension or removal.  419 U.S. at 582.  It also outlined the exceptions to this rule: "Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school." *Id*.  Defendants have not argued that Ms. Garcia falls into this category.  *See* ECF Nos. 31, 37.  I therefore conclude that Ms. Garcia has stated a procedural due process claim.

I also conclude that this was a clearly established violation of procedural due process. *Goss* has articulated the standard for student disciplinary hearings for over 40 years, as defendants acknowledge in their brief.  ECF No. 31 at 13.  In addition to the requirements of

notice and a hearing, which defendant do not contest is clearly established, *Goss* also established

the general rule that the hearing should precede removal.  419 U.S. at 582.  Absent compelling

circumstances, it is "beyond debate" that suspension prior to a hearing violates procedural due

process.  *Ali*, 763 F. App'x at 650.  Accordingly, I find defendants are not entitled to qualified

immunity on Ms. Garcia's procedural due process claim.

>     3.  Substantive Due Process Claim

"[S]ubstantive due process ensures the state will not deprive a party of property for an

arbitrary reason regardless of the procedures used to reach that decision."  *Hyde Park Co. v.*

*Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000).  In substantive due process cases

that do not implicate fundamental rights, "only the most egregious official conduct can be said to

be arbitrary in the constitutional sense."  *Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir.

2008) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998)) (internal quotations

omitted).  To succeed on a substantive due process claim, Ms. Garcia "must do more than show

that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or

misusing government power . . . . [She] must demonstrate a degree of outrageousness and a

magnitude of potential or actual harm that is truly conscience shocking."  *Id*. at 1221 (quoting

*Livsey v. Salt Lake Cty.*, 275 F.3d 952, 957–58 (10th Cir. 2001)) (internal quotations omitted).

"Not surprisingly, little governmental action is held unconstitutional under th[is] formulation[]."

*Id*.

Ms. Garcia argues only that the sanctions imposed on her were "draconian," arguing they

amount to expulsion because, though she was only suspended for a year, "she will not be able to

satisfy the conditions precedent that would allow her to return to the University to complete her

degree."  ECF No. 34 at 25–26.

I cannot find that the imposition of such sanctions was a clearly established violation of substantive due process. Though a suspension of one year is significant, Ms. Garcia has presented no case law suggesting it amounts to a reckless abuse of government power, or "shocks the conscience." Though she might be correct that the other sanctions imposed on her, the paper requirement and the psychological exam requirements, could ultimately prevent her from returning to MSU, this fact (if it is a fact) appears to be an indirect and unintentional consequence of the sanctions, rather than an intentional or recklessly disregarded consequence of defendants' actions. Thus, I find that defendants are entitled to qualified immunity, and Ms. Garcia's substantive due process claim must be dismissed.

### D. Rehabilitation Act Claim

Federal courts apply the standards articulated in Americans With Disability Act ("ADA") cases to claims under the Rehabilitation Act and vice versa. *Cummings v. Norton*, 393 F.3d 1186, 1190 n.2 (10th Cir. 2005). To establish a prima facie case of discrimination under the Rehabilitation Act, Ms. Garcia must allege facts showing she "(1) is a disabled person as defined by the ADA; (2) is qualified with or without reasonable accommodation; and (3) suffered discrimination because of that disability." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1037 (10th Cir. 2011).

Defendants challenge Ms. Garcia's showing on the third prong, claiming she has alleged no facts "establishing a connection between Ms. Garcia's alleged disability and MSU's issuance of a suspension." ECF No. 31 at 12. Ms. Garcia points to Professor Curl's incident report which stated that Ms. Garcia "lacks the capacity to remediate her behavior." ECF No. 34 at 15–16. She argues that this is sufficient to "plausibly tie Ms. Garcia's termination to her disability." *Id.* at 16. Though Professor Curl did not suspend Ms. Garcia, it is plausible that his comments about

her "capacity to remediate her behavior" informed Mr. Haden and Ms. Frank's decision to suspend her.

Defendants argue that Professor Curl's comments "did not relate to Ms. Garcia's alleged disability," but rather reflect Professor Curl's opinion that "she cannot and will not change her ways." ECF No. 37 at 6. Taking the allegations in the light most favorable to Ms. Garcia, it is plausible that Professor Curl's comments reflected his opinion that because of her disability, she would be unable to conform her behavior to the appropriate educational standards. Ms. Garcia has alleged that her disability affects her ability to communicate appropriately and learn. ECF No. 28 at 4–5. Professor Curl's comment suggests that he believed she lacked the ability to, as defendants put it, "change her ways," in this case referencing her ability to learn to communicate appropriately with her professors. ECF No. 37 at 6. I conclude that Ms. Garcia has plausibly alleged that she suffered discrimination because of her disability.

## ORDER

Defendants' motion to dismiss, ECF NO. 31, is GRANTED in part and DENIED in part.

1. The Court dismisses plaintiff's First Amendment claim, Fourteenth Amendment Substantive Due Process claim in their entirety.

2. The Court dismisses all remaining claims against defendants Metropolitan State University, Braelin Pantel, and Layton Seth Curl.

3. The Court dismisses all remaining official capacity claims for damages against remaining defendants.

All that remains in this case are Ms. Garcia's rehabilitation act claims against the MSU Board of Trustees, and her procedural due process claims against (1) Janine Davidson, Dave Haden, and

Kelli Frank in their official capacities seeking prospective relief, and (2) against Kelli Frank and Kristen Lyons in their individual capacities.

DATED this 24st day of February, 2020.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge